## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**
Jun 20 2018, 7:18 am
**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Don R. Hostetler
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Aaron T. Craft
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In re Termination of the Parent-Child Relationship of

H.M. (Minor Child),

and

A.M. (Mother),

*Appellant-Respondent,*

v.

Indiana Department of Child Services, et al.

*Appellee-Petitioner,*

June 20, 2018

Court of Appeals Case No.
18A-JT-27

Appeal from the Marion Superior Court Juvenile Division

The Honorable Marilyn Moores, Judge

The Honorable Scott Stowers, Magistrate

Trial Court Cause No.
49D09-1702-JT-211

**Altice, Judge.**

## Case Summary

[1] A.M. (Mother) appeals following the termination of her parental rights to her daughter, H.M. (Child). On appeal, Mother argues that the evidence was insufficient to support the termination of her rights.

[2] We affirm.

## Facts & Procedural History

[3] Child was born on April 4, 2014, to Mother and J.F. (Father).[1] During the summer of 2015, Mother and Child lived with Mother's boyfriend, D. (Boyfriend D), who sold drugs out of the home. In July 2015, Mother went through an informal adjustment with the Department of Child Services (DCS), agreeing to move Child to maternal aunt's home and keep Child away from Boyfriend D.'s home. Shortly thereafter, Mother took Child back to Boyfriend D's house, which was raided by police while they were there.

[4] As a result, DCS removed Child from Mother's care, and on July 30, 2015, filed a child in need of services (CHINS) petition. Around that same time, Mother tested positive for methamphetamine, marijuana, and cocaine. On November 18, 2015, the trial court found Child to be a CHINS based on

---

[1] Father consented to Child's adoption and does not participate in this appeal. Thus, our recitation of the facts is limited to those pertinent to the termination of Mother's parental rights.

Mother's admission that she needed assistance "in providing a stable home environment free from substance abuse." *Exhibits* at 6. The trial court entered a parental participation order requiring Mother to participate in home based therapy, home based case management, random drug screens, and intensive out-patient therapy (IOP) for substance abuse and follow all recommendations.

[5] Mother has been a drug addict since at least the summer of 2015. She prefers smoking methamphetamine, but also uses or has used marijuana, benzodiazepines, ecstasy (Molly), and synthetic mushrooms. Mother's drug use is complicated by her mental health disorders, such as substance abuse disorder, anxiety, and post-traumatic stress disorder. Throughout the course of the CHINS proceedings, Mother used methamphetamines "[s]ometimes daily, sometimes just weekly" to help her deal with "high anxiety and depression." *Transcript* at 74. Mother explained that methamphetamine helps her "to basically block out memories and thoughts or emotions pretty much for days." *Id*. at 90.

[6] Since the start of the CHINS proceedings, Mother has had a couple of brief periods of sobriety, but she has relapsed each time. In March 2016, Mother spent five days in a detox program at Harbor Lights and then started IOP at Families First. Mother followed that program up with a program focused on relapse prevention. She also participated in a domestic violence program. Mother did not complete these programs because she relapsed after Boyfriend D died.

[7]     By late summer of 2016 Mother entered a substance abuse treatment center at Volunteers of America (VOA) and stayed there for thirty-one days. Mother left because she did not think she "was taking the most out of the program." *Id*. at 76. After Mother relapsed, she re-enrolled in the VOA program on December 26, 2016, and stayed for twenty-eight days. At the end of this second stay, Mother earned a certificate of completion, which was qualified because she did not meet the program requirements for class attendance.

[8]     Mother relapsed yet again after the permanency plan was changed from reunification to adoption in February 2017. In April 2017, DCS provided Mother with a referral to the Tara Treatment Center (Tara) for twenty-one days. Mother completed the program with some difficulty, and a counselor at Tara noted that Mother's "prognosis to remain sober is guarded." *Exhibits* at 49. The counselor also noted that it "was difficult to assess [Mother's] level of motivation and progress due to minimal participation and not completing her assignments in a timely manner." *Id*. Upon her release, Mother did not begin IOP, but instead entered a program with Seeds of Hope, where she worked with a therapist who specialized in domestic violence and trauma as well as relapse prevention. Mother was discharged from Seeds of Hope after she learned she was pregnant. Mother relapsed again after the termination of her pregnancy and a domestic violence incident with her then-boyfriend, Boyfriend J. During the termination fact-finding hearing, Mother admitted that she used methamphetamine four days prior.

[9]     Mother's participation in other services was spotty. Although Mother initially struggled with accountability and time management while in a treatment facility, her behaviors generally improved and she became attentive and engaged in the programs. Outside of the highly structured environment of a treatment facility, however, Mother's participation in services was inconsistent. Mother admitted that she has not demonstrated an ability to care for Child. Although her interactions with Child during visits were generally positive, Mother would often cancel visits due to her drug use because she did not want Child to see her under the influence. While Mother was at Tara, she stopped visits with Child because of the distance. Mother has not seen Child since August 21, 2017. Due to Mother's inconsistent visitation and resulting negative impact on Child, Mother's visitation with Child was suspended on August 24, 2017.

[10]    In addition to her drug addiction, Mother has a history of domestic violence and has been involved in two abusive relationships. When DCS first became involved, Mother and Child were living with Boyfriend D, a drug dealer, who was abusive toward Mother. After Child was removed from Mother's care, she attended domestic violence classes, but did not complete the program because she relapsed after the death of Boyfriend D, with whom she was still romantically involved. Mother next became involved with Boyfriend J, who both physically and mentally abused Mother. Mother lived with Boyfriend J until July 2017, when she obtained a protective order against him. Boyfriend J's abusive actions caused Mother to miss several visits with Child.

[11]     Mother's employment during the proceedings has been both brief and sporadic. In the year before the fact-finding hearing, Mother had been employed at Toyota, working on an assembly line, and also at a fire/water restoration company. Mother was not employed at the time of the hearing, but testified that if Child were returned to her care that she planned to find work with the restoration company or through a temporary service.

[12]     At the time of the fact-finding hearing, Mother was living with her grandmother, with whom she has a loving relationship. Mother's grandmother, however, has significant health concerns that make it difficult for her to be a caregiver. Although there are no problems with the house itself, the concern remains Mother's drug use and those with whom Mother associates.

[13]     Child was removed from Mother's care when she was sixteen months old. For the first year, Child was shuffled among different foster placements. Child has been in her current placement with pre-adoptive foster parents since October 2016. The pre-adoptive foster home provides Child with a loving, stable, and supportive environment, and Child is well bonded with the pre-adoptive foster parents. The pre-adoptive foster parents are open to and supportive of including Child's great-grandmother, to whom Child is bonded and has expressed a desire to see, in Child's life.

[14]     Angela Hardy, a home-based therapist, was assigned to work with Child in April 2017 after Child displayed negative and fearful behaviors, including accidents at school, nightmares, and feelings of separation anxiety from her

foster parents at night. Hardy has worked with Child twice a week and noted that Child has a strong desire to please and a need for approval, which she attributes to Child's feelings of insecurity brought about by the situation. Hardy noted that Child demonstrated marked improvement and stability after visits with Mother ceased—she had fewer accidents, was "happier" and more "carefree childlike." *Transcript* at 49. In Hardy's opinion, termination of Mother's parental rights is in Child's best interest as Child needs permanency and stability.

[15] Kay Ulery has been Child's Guardian ad Litem (GAL) for more than two years and has visited with Child on a monthly basis. Ulery has significant concerns about Mother's fitness to parent in light of Mother's inconsistent participation in services, unstable housing and employment situations, repeated cancellations of visits, and her continuing drug use. Ulery testified that Child's best interests would be served by placement in a stable, permanent environment and that she did not believe Child would benefit by giving Mother additional time to complete services. Zack Inman became the family case manager (FCM) only a month before the fact-finding hearing, but he reviewed the file and spoke with the prior case FCM and service providers. FCM Inman believed that Mother had failed to benefit from services as evidenced by the fact that she continues to struggle with drug addiction and lacks a stable home environment. FCM Inman also testified that giving Mother additional time would only delay the permanency that Child needs. Both Ulery and FCM Inman testified that

Child's best interests would be served by termination of Mother's parental rights and adoption by her foster parents.

[16] DCS filed a petition to terminate Mother's parental rights on February 20, 2017. Fact-finding hearings on the termination petition were held on October 3, 10, and 25, 2017. On December 12, 2017, the trial court entered an order terminating Mother's parental rights to Child. Mother now appeals. Additional facts will be provided as necessary.

## Discussion & Decision

[17] When reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences most favorable to the judgment. *Id*. In deference to the trial court's unique position to assess the evidence, we will set aside its judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*. Thus, if the evidence and inferences support the decision, we must affirm. *Id*.

[18] The trial court entered findings in its order terminating Mother's parental rights. When the trial court enters specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id*. "Findings are clearly erroneous only when the

record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). A judgment is clearly erroneous only if the findings do not support the court's conclusions or the conclusions do not support the judgment thereon. *Id.*

[19] We recognize that the traditional right of parents to "establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. Although parental rights are of constitutional dimension, the law provides for the termination of these rights when parents are unable or unwilling to meet their parental responsibilities. *In re R.H.*, 892 N.E.2d 144, 149 (Ind. Ct. App. 2008). In addition, a court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding the termination. *In re K.S.*, 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). The purpose of terminating parental rights is not to punish the parents, but to protect their children. *Id.*

[20] Before an involuntary termination of parental rights may occur in Indiana, DCS is required to allege and prove by clear and convincing evidence, among other things:

> (B) that one (1) of the following is true:
>
> > (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services[.]

Ind. Code § 31-35-2-4(b)(2)(B). DCS must also prove by clear and convincing evidence that termination is in the best interests of the child. I.C. § 31-35-2-4(b)(2)(C).

[21] Mother challenges the court's conclusions that DCS presented sufficient evidence to establish that there is a reasonable probability the conditions resulting in Child's removal or continued placement outside Mother's care will not be remedied and that the continuation of the parent-child relationship poses a threat to Child's well-being. *See* I.C. § 31-35-2-4(b)(2)(B)(i), (ii). We note that DCS was required to establish only one of the three requirements of subsection (b)(2)(B) by clear and convincing evidence before the trial court could terminate parental rights. *See In re L.V.N.*, 799 N.E.2d 63, 69 (Ind. Ct. App. 2003). Here, we focus our review on the requirements of subsection (b)(2)(B)(i).

[22] In determining whether there is a reasonable probability that the conditions resulting in Child's removal or continued placement outside the home will be remedied, the trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re J.T.*, 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), *trans. denied*. The court must also evaluate the parent's habitual patterns of conduct to

determine whether there is a substantial probability of future neglect or deprivation of the child. *Id.* In conducting this inquiry, courts may consider evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *A.F. v. Marion Cnty. Office of Family & Children*, 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), *trans. denied*. The court may also consider the parent's response to the services offered through DCS. *Lang v. Starke Cnty. Office of Family & Children*, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007), *trans. denied*.

[23]     In terminating Mother's parental rights, the court found:

> There is a reasonable probability that the conditions that resulted in the child's removal and continued placement outside of the home will not be remedied by her mother. [Mother] has had over two years to address her substance abuse addiction and continues to relapse which has negatively impacted her ability to parent. Despite several attempts at substance abuse treatment she continues to use illegal substances and has used methamphetamine as recently as four days before this Termination Trial began.

*Appellant's Appendix* at 27. Mother argues that the court's finding in this regard is not supported by clear and convincing evidence because the court did not consider that Mother entered into an intensive, in-patient drug treatment program just prior to the second day of the fact-finding hearing. Mother asserts that her current treatment program was rigorous and afforded her a psychiatric evaluation for treatment of PTSD, anxiety, and depression. Mother also asserts that she now fully appreciates the importance of aftercare treatment. In

Mother's view, the court should have waited to see if her most-recent efforts to gain sobriety would prove successful before terminating her parental rights. Mother's request simply boils down to a request to reweigh the evidence.

[24] Child was initially removed and adjudicated a CHINS based on Mother's admission that she "need[ed] assistance in providing a stable home environment free from substance abuse." *Exhibits* at 6. DCS presented overwhelming evidence that Mother is unlikely to remedy these conditions.

[25] Indeed, Mother has had more than two years to achieve and maintain sobriety, but her efforts have proven unsuccessful. Although she has had brief periods of sobriety while in treatment programs, her history shows that she relapses after the structure is removed and life presents another challenge. Mother admits that she has no control over her addiction and that she uses meth to deal with stress. Mother agrees that she cannot care for Child when she is on meth and she does not want Child to see her when she is high. Service providers explained that a meth addict is not a fit parent because one cannot leave a four-year-old child to fend for herself while the parent goes on a days-long meth bender. Mother even testified that meth helps her "to basically block out memories and thoughts or emotions pretty much *for days*." *Transcript* at 90 (emphasis supplied).

[26] The overarching issue in this case is Mother's addiction to meth and the damaging impact her substance abuse has had on other aspects of Mother's life and Child's stability and development. While Mother's desire for sobriety is

commendable, she has not been able to maintain her sobriety time and time again. Based on the evidence presented by DCS, the court reasonably concluded that Mother's last-ditch effort was unlikely to succeed in light of her two-year history of substance-abuse treatment followed by relapses. The court's finding that Mother is unlikely to remedy the conditions that resulted in Child's removal and continued placement outside the home is supported by sufficient evidence.

[27] Mother argues that the trial court's conclusion that termination is in the best interests of Child is clearly erroneous. In determining whether termination of parental rights is in the best interests of a child, the trial court is required to look beyond the factors identified by DCS and consider the totality of the evidence. *In re J.C.*, 994 N.E.2d 278, 290 (Ind. Ct. App. 2013). In so doing, the trial court must subordinate the interest of the parent to those of the child, and the court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. *McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003). Our Supreme Court has explained that "[p]ermanency is a central consideration in determining the best interests of a child." *In re G.Y.*, 904 N.E.2d 1257, 1265 (Ind. 2009). "Moreover, we have previously held that the recommendations of the case manager and court-appointed advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests." *In re J.S.*, 906 N.E.2d 226, 236 (Ind. Ct. App. 2009).

[28]    The trial court concluded that termination was in Child's best interests because it "would allow her to be adopted into a stable and permanent home where her needs will be safely met." *Appellant's Appendix* at 8. The court's finding in this regard is in line with the recommendation of Child's home-based therapist, GAL, and FCM, each of whom testified that Child needs permanency and that termination of Mother's parental rights is in Child's best interests. Further, as we concluded above, the court did not err in finding that the conditions resulting in removal or continued placement outside the home will not be remedied. The court's conclusion that termination is in the best interests of Child is not clearly erroneous.

[29]    Judgment affirmed.

Najam, J. and Robb, J., concur.